IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERALD GLENN WALKER,                    CASE NO. CV F 09-1183 LJO DLB

                    Plaintiff,          **SUMMARY JUDGMENT DECISION**
         vs.                            (Doc. 22.)

BRAND ENERGY SERVICES, LLC,

                    Defendant.
_____/

## **INTRODUCTION**

Defendant Brand Energy Services, LLC ("BES") seeks summary judgment in that plaintiff Gerald Glenn Walker ("Mr. Walker") is unable to establish a prima facie case for his employment retaliation/termination claims. Mr. Walker responds that the evidence shows that he was "set up" and terminated because he complained of his supervisor's discriminatory conduct. This Court considered BES' summary judgment motion on the record[1] and VACATES the June 30, 2010 hearing, pursuant to Local Rule 230(g). For the reasons discussed below, this Court DENIES BES summary judgment.

---

[1]     This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument, document, objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. Unless otherwise noted, this Court does not rule on objections in a summary judgment context.

1

# BACKGROUND

## BES' Operations

From 1989 to November 5, 2008, Mr. Walker worked as a carpenter, foreman and superintendent for BES, a construction company which rents, erects and dismantles scaffold platforms. Mr. Walker is black.

A division of BES is located in Bakersfield ("Bakersfield division"). Since 1989, the Bakersfield division performed work in Bakersfield at the Big West Refinery ("Big West job") and for Kimberlina Solar Thermal Energy ("Kimberlina job"). In addition, BES operates as another division at its Long Beach Hiring Center in Long Beach.

The Bakersfield division employs carpenters who are members of the United Brotherhood of Carpenters and Joiners of America ("union"). BES and the union are parties to the National Maintenance Agreement ("NMA") and other agreements which establish wages and other terms for union carpenters whom BES employs.

BES offers employees SilentWhistle, a third-party confidential and anonymous reporting system. BES employees may access SilentWhistle through its website or toll free telephone number.

## Mr. Walker's Relocation To Bakersfield

Mr. Walker started to work for BES in Los Angeles in 1989. He was promoted from carpenter to foreman, general foreman and superintendent. When living and working in Los Angeles, Mr. Walker met BES project manager Donald Hall ("Mr. Hall"), who is black. After Mr. Hall was promoted to the Bakersfield division's project manager, Mr. Hall and Mr. Walker discussed Mr. Walker's performance of "turnaround" jobs. In his deposition, Mr. Walker described turnaround jobs to require workers to "go through a refinery and clean certain pipes, vessels and stuff like that. And would probably last maybe for weeks, six weeks and it would be maybe 12-hour shifts, seven days a week." The scaffolding portion of a turnaround required building scaffolding for workers to access equipment, including pipes and vessels, and to remove scaffolding. Turnarounds are favored for those who want more hours and money given increased overtime.

Mr. Walker worked under Mr. Hall's supervision of turnarounds and other jobs for approximately six years prior to relocating to Bakersfield in 2007. Mr. Hall had alerted Mr. Walker to

1   upcoming turnarounds to determine if Mr. Walker desired to travel to Bakersfield to work for Mr. Hall.

2   Mr. Hall had several discussions with Mr. Walker about relocating to Bakersfield and encouraged Mr.

3   Walker to relocate.  Mr. Walker knew that Mr. Hall would be his supervisor if Mr. Walker relocated to

4   Bakersfield.  Mr. Walker had neither concerns nor reservations about relocating to Bakersfield to work

5   for Mr. Hall.

6        During Mr. Hall's supervision, Mr. Walker and Mr. Hall got along.  Mr. Hall never criticized

7   Mr. Walker's work to his face and never made derogatory comments about Mr. Walker to his face.  Prior

8   to Mr. Walker's termination, Mr. Hall disciplined Mr. Walker only once.

9        During January 1, 2007 to November 5, 2008, Mr. Walker's job classification fluctuated from

10  general foreman to superintendent depending on the type of job, level of work and/or number and

11  classification of employees assigned to the job.  During the same time period when under Mr. Hall's

12  supervision, Mr. Walker's positions moved among foreman, general foreman and superintendent no less

13  than 30 times.

14       During August 5, 2005 to November 5, 2008, Mr. Walker worked on 46 jobs in Los Angeles and

15  Bakersfield.  During the same time period, Mr. Walker's wage was computed based on his job title and

16  corresponding amount established by the NMA and agreements between BES and the union.

17  **Mr. Walker's Big West Job Classification Change**

18       During January 21, 2007 to October 8, 2008, Mr. Walker worked primarily on the Big West job.

19  When working under Mr. Hall's supervision at the Big West and Kimberlina jobs, Mr. Walker was

20  required to prepare paperwork, including hazard analyses, work permits, and daily and weekly time

21  sheets.

22       On September 9, 2008, Mr. Walker's job title changed from general foreman to foreman of the

23  Big West job although he continued to perform the same work and responsibilities.  Mr. Walker testified

24  that he changed from general foreman to foreman because the Big West job could not maintain Mr.

25  Walker's pay grade given "we didn't have a certain number of people."

26       Mr. Walker called SilentWhistle to make an anonymous complaint about his classification

27  change.  Mr. Walker did not claim that Mr. Hall made the classification change based on race.

28  / / /

3

### Mr. Walker's Comments About Mr. Hall

On September 30, 2008, BES Industrial Branch Manager Dale Garon ("Mr. Garon"), Human Resources Director Cheryle Kerksieck ("Ms. Kerksieck") and two other BES managers visited the Bakersfield division and met each of its active, on-site employees to assess morale.  Employees completed questionnaires and were interviewed.

Mr. Walker testified that he did not identify Mr. Hall's conduct or statements regarding race or discrimination in his September 30, 2008 questionnaire answers.  Mr. Walker testified that the interviewers "wanted to know what was going on and how was we getting along and just a lot of questions like that."  Mr. Walker testified that he told his interviewer Ms. Kerksieck that "Don Hall has been . . . using the N word toward . . . Blacks and . . . he was treating Hispanics differently from Black employees."[2]  Mr. Walker attributes Mr. Garon to have "jumped up and got hostile and hollered at me and made me feel real uncomfortable."  Mr. Walker claims that Mr. Garon and Ms. Kerksieck "turned the whole thing around on me" by accusing him of making derogatory remarks about Mexicans needing "to go work in the fields."  Mr. Walker further claims that the interview "just blew up once I started opening up to telling what was going on."  Mr. Walker testified that directly after his interview, no action was taken and that he continued to work at the Big West job.

### Mr. Walker's Transfers To Kimberlina Job

As of July 13, 2008, Mr. Walker had been reassigned to the Kimberlina job.  Mr. Walker testified that Mr. Hall sent him to the Kimberlina job "because he didn't have anybody else qualified to go out there at the time" and "we didn't expect the job to expand as big as it was."  The Kimberlina job was more substantial than anticipated, and Mr. Walker filled in as the Kimberlina job superintendent during weeks ending July 13, 2008 to August 17, 2008.  Mr. Walker testified that he considered himself the best qualified for the position at the start.  On August 28, 2008, to accommodate Mr. Walker's request to return to the Big West job, BES assigned Leon Bryant ("Mr. Bryant") as the Kimberlina job superintendent.  Mr. Walker returned to the Big West job after he trained Mr. Bryant and introduced him to the Kimberlina crew.

---

[2]   During January 1, 2007 to January 8, 2009, all foremen, general foremen and superintendents at the Bakersfield division and Big West and Kimberlina jobs were Hispanic or black.

4

1    On October 7, 2008, BES terminated Mr. Bryant for sleeping on the job.  Mr. Hall asked Mr.

2    Walker to transfer to the Kimberlina job because Mr. Walker, using Mr. Hall's words from his

3    declaration, "had served as superintendent of the Kimberlina Job," "was qualified," and "was already

4    familiar with the crew."  Mr. Walker preferred to remain on the Big West job given that the Kimberlina

5    job neared completion and claims that Mr. Hall indicated that Mr. Walker could return to the Big West

6    job upon the Kimberlina job's completion.  Mr. Walker accepted transfer from Big West job foreman

7    to Kimberlina job superintendent.  With the transfer, Mr. Walker's hourly wage increased from $24.25

8    to $35.55.  After Mr. Walker's transfer, his foreman position at the Big West job was not filled.

9    During October 8-31, 2008, Mr. Walker worked as the Kimberlina job superintendent.  The

10   position required Mr. Walker to complete daily and weekly time sheets, hazard analyses, daily log

11   sheets, material lists and rental return forms by each week's end.  Mr. Walker completed the daily and

12   weekly time sheets, daily log sheets and hazard analyses during his first and second weeks at the

13   Kimberlina job.

14   **Reassignment To Long Beach Hiring Center**

15   During the week of October 27, 2008, Mr. Hall and Industrial Branch Manager Mr. Garon

16   discussed where to transfer remaining Kimberlina job employees.  Mr. Hall and Mr. Garon discussed

17   that the Big West job was not available for Mr. Walker given the lack of work there.  Mr. Hall and Mr.

18   Garon discussed transferring remaining Kimberlina job employees to the Long Beach Hiring Center.

19   Mr. Hall declares that on October 30, 2008, Mr. Hall advised Mr. Walker that due to lack of

20   work, Mr. Walker would not return to the Big West job after the Kimberlina job was completed.[3]  Mr.

21   Hall further declares that he advised Mr. Walker that Mr. Hall had spoken to Mr. Garon and that there

22   was available work at the Long Beach Hiring Center.  Mr. Hall completed an October 31, 2008 slip to

23   transfer Mr. Walker to the Long Beach Hiring Center effective that date.  Mr. Walker claims that he was

24   not told that he was transferred to the Long Beach Hiring Center and points to prior representations that

25   he would return to the Big West job on the Kimberlina job's completion.  Mr. Walker further claims he

26   did not receive the transfer slip until November 6, 2008 by registered mail sent on November 5, 2008.

27

28   [3]    BES points out that Big West filed for bankruptcy on December 22, 2008, and all former Big West job employees were transferred, except Mr. Hall, a carpenter and a helper.

1   On October 31, 2008, Mr. Walker, at Mr. Hall's instruction, completed slips to transfer Noel

2   Aceves, Daniel Gonzalez and Gabriel Galvez, who were Hispanic employees under Mr. Walker's

3   supervision at the Kimberlina job, to the Long Beach Hiring Center.  Other remaining employees at the

4   Kimberlina job were transferred to the Long Beach Hiring Center. BES points to the absence of a claim

5   or information that Kimberlina job employees transferred to the Long Beach Hiring Center reported or

6   complained of Mr. Hall's racially discriminatory conduct.

7   **Week Of October 27, 2008 Paperwork For The Kimberlina Job**

8   During October 27-31, 2008, Mr. Walker and his crew continued to work on the Kimberlina job,

9   which was completed on Friday, October 31, 2008.  Mr. Walker claims that on the afternoon of October

10   31, 2008, Mr. Walker and his crew spent two hours removing scaffolding on the "east side" of the

11   Kimberlina job for a second client ("Basin Valve job").  Mr. Walker testified that by the end of October

12   31, 2008 (around 3:30 p.m.), he had completed paperwork for the Kimberlina job but needed a different

13   work order number for the Basin Valve job "to match up so they would be billed right."  Mr. Walker

14   attributes Mr. Hall to have instructed him to "hold on to the paperwork until we get the job numbers to

15   complete it and turn it back in."

16   Mr. Walker asked Mr. Hall where he was to report to work on Monday, November 3, 2008.  Mr.

17   Walker attributes Mr. Hall to have responded that Mr. Hall would contact John Finch ("Mr. Finch"), the

18   Big West job maintenance coordinator, and telephone Mr. Walker over the weekend.  Mr. Walker further

19   attributes Mr. Hall to have indicated that work was picking up at the Big West job to require a potential

20   return of Mr. Walker and a couple of his crew.  Mr. Walker claims that he was left with the impression

21   that he would return to the Big West job.

22   Mr. Walker had no contact with Mr. Hall over the November 1-2, 2008 weekend but the two

23   traded telephone messages on Monday, November 3, 2008.  Mr. Walker and Mr. Hall spoke by

24   telephone around 9-10 a.m. on Tuesday, November 4, 2008.  Mr. Walker attributes Mr. Hall to say that

25   Mr. Hall needed to speak with Mr. Finch "about me going to work."  Mr. Walker testified that he

26   provided Mr. Hall "the hours the guys worked on the Kimberlina job and the other job and then he told

27   me that . . . we could turn in the paperwork later . . ."  Mr. Walker further testified that he told Mr. Hall

28   he was headed from Bakersfield to Los Angeles to fix a broken water pipe at his mother's home.

### Mr. Walker's Termination

Human Resources Director Ms. Kerksieck declares that as of October 31, 2008, BES "had no intention or desire to terminate" Mr. Walker.  BES notes that Mr. Walker took paperwork for the Kimberlina and Basin Valve jobs when he left on the afternoon of October 31, 2008.

Mr. Walker had not submitted the paperwork by Monday, November 3, 2008.  During November 3-5, 2008, Ms. Kerksieck and Mr. Hall were in contact regarding Mr. Walker's missing paperwork.  Ms. Kerksieck advised Mr. Hall to contact Mr. Walker to set a deadline to submit the missing paperwork and to warn Mr. Walker that failure to meet the deadline "would result in his termination."

No later than 3 p.m. on November 5, 2008, Mr. Hall directed Mr. Walker to submit the missing paperwork no later than 4:30 p.m. that day.  In his deposition, Mr. Walker attributed Mr. Hall to say: "Hey, you don't have the paperwork in by 4:30, I got to terminate you."  Mr. Walker responded "turn off my phone" and "do whatever you gotta do."  Mr. Walker notes that Mr. Hall knew that Mr. Walker was in Los Angeles and could not comply with Mr. Hall's directive to submit the paperwork prior to 4:30 p.m. in Bakersfield.

Mr. Hall telephoned Ms. Kerksieck to relay his conversation with Mr. Walker.  Ms. Kerksieck advised Mr. Hall to wait until 4:30 p.m. and that if Mr. Walker failed to meet the deadline, he would be terminated for insubordination.  Mr. Walker did not submit the paperwork prior to the deadline.

At 5 p.m. on November 5, 2008, Mr. Hall telephoned Ms. Kerksieck that he had not received the paperwork from Mr. Walker.

Ms. Kerksieck claims that she made the decision to terminate Mr. Walker and declares that she relied on the following:

> (i) as superintendent of the Kimberlina Job, Plaintiff was required to timely submit the project paperwork to Hall each week, (ii) after Plaintiff failed to submit the paperwork on October 31, 2008, Hall had set a deadline in which Plaintiff was required to submit the paperwork and had warned Plaintiff that he would be terminated if he failed to comply, (iii) Plaintiff failed to comply, and (iv) Plaintiff told Hall to "turn off his phone" and "do what you gotta do."

Ms. Kerksieck drafted a November 5, 2008 notice and letter of termination and sent them to Mr. Hall, who signed and mailed them to Mr. Walker, who received them on November 6, 2008.  Within a few days of November 5, 2008, Mr. Walker turned in the missing paperwork and his cell phone.

7

Mr. Walker testified that after receiving his termination form, Industrial Branch Manager Mr. Garon telephoned him that there was available work at the El Segundo Chevron refinery ("Chevron job"). Mr. Walker testified that he informed Mr. Garon that he could not accept the Chevron job without a per diem. Thereafter, Mr. Walker neither sought nor applied for work through the Long Beach Hiring Center.

### January 13, 2009 Fax From Mr. Walker

Ms. Kerksieck received a January 13, 2009 fax from Mr. Walker which comprised entries of Mr. Walker's version of events on certain days. Mr. Walker testified that he prepared fax's information, which was true and accurate. The October 31, 2008 entry reflects:

> I came to Donald Halls office to turn in the paper work for the kimberlina job I told him that I did not have time to finish it because Donald Hall did not give me the po# or the job# until the end of the day he said you can go home and do the paper work this weekend I ask him do I work Monday he said that he have to get with john finch and that he will call me and let me know

The November 5, 2008 entry reflects:

> Donald Hall called me harassing me about the paper work he threaten to terminate me if I do not have the paper work in by 4:30 pm today I told Donald Hall all guys on crew hours so he can get they time in on time I told him to do what he had to do because there is on way I will be able to make it from Los Angeles to Bakersfield one hour

### Chester Huddleston Declaration

To oppose summary judgment, Mr. Walker offers the September 2, 2009 declaration of Chester Huddleston ("Mr. Huddleston"), a BES employee since 1994 and a carpenter/foreman since April 2007. In his declaration, Mr. Huddleston claims that Mr. Walker made several statements a week after the September 2008 meeting with BES management about "complaints many employees had" with Mr. Hall. Mr. Huddleston states that Mr. Hall told Mr. Huddleston to stay away from Mr. Walker because Mr. Walker "was trouble and they were going to get rid of Gerald" and "were going to set Gerald Walker up to get rid of him as an employee." Mr. Huddleston further declares:

> Don also told me that Dale Garon told him (Don Hall) the things Gerald Walker had said about Don during the previous meeting. Don Hall was angry at what Gerald had said and he indicated that getting rid of Gerald was retaliation for what Gerald Walker had said about Don during that meeting.

/ / /

/ / /

8

**Other Terminations**

During May through November 2008, four of approximately 40 BES employees were terminated. Black employees Mr. Bryant and Mr. Walker were terminated for sleeping on the job and insubordination, respectively.  Two Hispanic employees were terminated for lack of work eligibility documentation and job abandonment, respectively.

**Mr. Walker's Administrative Complaints**

On December 9, 2008, Mr. Walker filed a discrimination complaint with the California Department of Fair Employment and Housing ("DFEH").  On February 5, 2009, Mr. Walker filed with DFEH a corrected discrimination complaint to allege that he was terminated "in retaliation for having reported the derogatory comments about my race made by Don Hall, Sr."  On March 25, 2009, DFEH closed the matter and issued Mr. Walker a right-to-sue letter.

**Mr. Walker's Claims**

On July 3, 2009, Mr. Walker filed his complaint ("complaint") in this action to allege that Mr. Hall "engaged in conduct Plaintiff reasonably and objectively felt was discrimination, including but not limited to racial discrimination."  The complaint alleges that Mr. Walker "complained about the racially discriminatory conduct of Don Hall during an internal investigation of Hall" and was terminated as a result of this "Protected Conduct" (complaining of Mr. Hall's conduct).

The complaint alleges claims that:

1.    Mr. Walker's termination was unlawful under 42 U.S.C. 1981 ("section 1981") and "occurred with reckless indifference to Plaintiff's federally secured rights" ("section 1981 claim");

2.    Mr. Walker's Protected Conduct was protected under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code, §§ 12900, et seq., in particular, California Government Code section 12940(h) ("section 12940(h)"), and his termination violated section 12940(h) ("FEHA claim"); and

3.    Mr. Walker's Protected Conduct was protected by California public policy and his termination violated California public policy ("public policy claim").

The complaint seeks recovery for Mr. Walker's lost income and benefits, emotional distress and

1   punitive damages.

2   ## DISCUSSION

3   ### Summary Judgment Standards

4       BES seeks summary judgment in that Mr. Walker lacks a prima facie case of unlawful retaliation

5   or pretext to support the section 1981 and FEHA claims and the public policy claim fails without a valid

6   section 1981 or FEHA claim. Mr. Walker responds that "there is direct evidence of a retaliatory motive"

7   to avoid the burden shifting test which BES seeks to employ.

8       F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on

9   all or part of the claim." "A district court may dispose of a particular claim or defense by summary

10  judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense."

11  *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

12      Summary judgment is appropriate when there exists no genuine issue as to any material fact and

13  the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c)(2); *Matsushita Elec. Indus.*

14  *v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific*

15  *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to

16  "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."

17  *Matsushita Elec.*, 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin*

18  *Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

19      On summary judgment, a court must decide whether there is a "genuine issue as to any material

20  fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v.*

21  *Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398

22  U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct.

23  486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).

24  The evidence of the party opposing summary judgment is to be believed and all reasonable inferences

25  that may be drawn from the facts before the court must be drawn in favor of the opposing party.

26  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587,

27  106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require

28  submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

1    *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

2       To carry its burden of production on summary judgment, a moving party "must either produce

3 evidence negating an essential element of the nonmoving party's claim or defense or show that the

4 nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

5 persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

6 Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

7 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

8 court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech*

9 *Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material.

10 Only disputes over facts that might affect the outcome of the suit under the governing law will properly

11 preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

12       "If a moving party fails to carry its initial burden of production, the nonmoving party has no

13 obligation to produce anything, even if the nonmoving party would have the ultimate burden of

14 persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

15 "If, however, a moving party carries its burden of production, the nonmoving party must produce

16 evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

17 at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

18 fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

19 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of

20 summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

21 the showing sufficient to establish the existence of an element essential to that party's case, and on

22 which that party will bear the burden of proof at trial.")

23       "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

24 the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

25 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough

26 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp.*

27 *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

28 289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the

1    plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

2       As discussed below, Mr. Walker presents direct evidence of BES' retaliatory motive to defeat

3    summary judgment and raises factual issues to require their submission to a jury.

4    **Section 1981 And FEHA Claims**

5       Mr. Walker's section 1981 and FEHA claims are premised on retaliation for his "protected

6    conduct" of complaining "about the racially discriminatory conduct of Mr. Hall."  BES argues that the

7    claims "should be reviewed under the retaliation analysis of Section 1981 and/or the FEHA."

8       Section 1981 provides in pertinent part:

9          (a) Statement of equal rights

10          All persons within the jurisdiction of the United States shall have the same right
11       in every State and Territory to make and enforce contracts, to sue, be parties, give
         evidence, and to the full and equal benefit of all laws and proceedings for the security of
12       persons and property as is enjoyed by white citizens, and shall be subject to like
         punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no
13       other.

          . . .
14
          (c) Protection against impairment
15
          The rights protected by this section are protected against impairment by
16       nongovernmental discrimination and impairment under color of State law.

17       Section 1981 "by its broad terms, . . . proscribe[s] discrimination in the making or enforcement

18    of contracts against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273,

19    295, 96 S.Ct. 2574 (1976).   Under section 1981, "discrimination based on 'ancestry or ethnic

20    characteristics' is prohibited." *Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 850 (9th

21    Cir. 2004).

22       California Government Code section 12940(h) renders unlawful for an "employer, labor

23    organization, employment agency, or person to discharge, expel, or otherwise discriminate against any

24    person because the person has opposed any practices forbidden under this part or because the person has

25    filed a complaint, testified, or assisted in any proceeding under this part."  California Government Code

26    section 12940(h) "incorporates other unlawful employment practices defined in other parts of section

27    12940, and forbids retaliation against anyone opposing any such unlawful employment practice." *Jones*

28    *v. Lodge at Torrey Pines Partnership*, 42 Cal.4th 1158, 1164, 72 Cal.Rptr.3d 624 (2008).

1

**Burden Shifting Framework**

2   BES notes that section 1981 and FEHA claims are "governed by the legal framework applicable

3 to alleged violations under Title VII."  Elements of a section 1981 claim in the employment context are

4 "akin" to a Title VII race discrimination claim for disparate treatment.  *See Manatt v. Bank of America*,

5 339 F.3d 792, 798 (9th Cir. 2003); *Jones v. Robinson Property Group*, 427 F.3d 987, 992 (5th Cir. 2005)

6 ("analysis under both statutes are identical").

7   For section 1981 and FEHA claims, courts apply the *McDonnell Douglas*[4] burden-shifting

8 framework.  *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007); *Miller v. Fairchild Industries, Inc.*,

9 797 F.2d 727, 730-731 (9th Cir. 1986) (order and allocation of proof for retaliation claims follow familiar

10 scheme announced in *McDonnell Douglas)*.  "At the first step of *McDonnell Douglas*, the plaintiff must

11 establish a prima facie case of discrimination or retaliation."  *Metoyer*, 504 F.3d at 931, n. 6.  "If the

12 plaintiff makes out her prima facie case of either discrimination or retaliation, the burden then 'shifts

13 to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory [or

14 retaliatory] conduct.'" *Metoyer*, 504 F.3d at 931, n. 6 (quoting *Vasquez v. County of Los Angeles*, 349

15 F.3d 634, 640 (9th Cir. 2003)).

16   "Finally, at the third step of *McDonnell Douglas*, if the employer articulates a legitimate reason

17 for its action, 'the presumption of discrimination drops out of the picture, and the plaintiff may defeat

18 summary judgment by satisfying the ususal standard of proof required'" under F.R.Civ.P. 56(e)(2).

19 *Metoyer*, 504 F.3d at 931 (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir.

20 2006) (citations and internal quotation marks omitted)).

21   As an alternative to the *McDonnell Douglas* framework, a plaintiff responding to a summary

22 judgment motion "may simply produce direct or circumstantial evidence demonstrating that a

23 discriminatory [or retaliatory] reason more likely than not motivated [the employer]."  *McGinest v. GTE*

24 *Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citation omitted).  The "*McDonnell Douglas* test is

25 inapplicable where the plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc.*

26 *v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613 (1985).

27

28    [4]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

1    "When the plaintiff offers direct evidence of discriminatory [or retaliatory] motive, a triable issue

2    as to the actual motivation of the employer is created even if the evidence is not substantial. . . . it need

3    be 'very little'" *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) quoting *Lindahl v.*

4    *Air France*, 930 F.2d 1434, 1438 (9th Cir 1991). "Direct evidence is evidence which, if believed, proves

5    the fact [of retaliation] without inference or presumption." *Goodwin*, 150 F.3d at 1221 (citation

6    omitted). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory

7    statements or actions by the employer." *Coghlan v. American Seafoods Co. LLC.,* 413 F.3d 1090, 1095

8    (9th Cir. 2005).

9                                    **Direct Evidence Of Retaliation**

10           Mr. Walker contends that direct evidence of retaliation defeats summary judgment for BES.  Mr.

11   Walker notes that direct evidence of retaliatory motive may be as simple as "an angry reaction to

12   protected conduct." *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 736, 103 S.Ct. 2161

13   (1983) (direct evidence of retaliatory purpose includes to "get even with" and "hurt" individual);

14   *Colarossi v. Coty US Inc.*, 97 Cal.App.4th 1142, 1153, 119 Cal.Rptr.2d 131 (2002) ("expressed desire

15   to get revenge on the people who cooperated in the investigation" demonstrated retaliatory motive).

16   Moreover, "[d]irect evidence of retaliation may consist of remarks made by decisionmakers displaying

17   a retaliatory motive." *Iwekaogwu v. City of Los Angeles*, 75 Cal.App.4th 803, 816, 89 Cal.Rptr.2d 505

18   (2002).

19           As direct evidence of retaliation, Mr. Walker points to:

20           1.      Mr. Huddleston's declaration statements that Mr. Hall was aware of "the things Gerald

21                   Walker had said about Don" and that Mr. Hall "was angry at what Gerald had said and

22                   he indicated that getting rid of Gerald was retaliation";

23           2.      Mr. Hall's transfer of Mr. Walker to the Kimberlina job after misrepresenting that Mr.

24                   Walker would return to the Big West job;

25           3.      Mr. Hall's ruse about lacking information for Mr. Walker to complete Kimberlina job

26                   paperwork and telling Mr. Walker to keep the paperwork and prepare it later; and

27           4.      Mr. Hall's directive to submit the paperwork by a deadline Mr. Walker could not meet

28                   because he was in Los Angeles.

                                              14

1       Mr. Walker criticizes BES' characterization of Human Resources Director Ms. Kerksieck as the

2  "decisionmaker" given that Ms. Kerksieck relied on Mr. Hall's incorrect information that Mr. Walker

3  was at fault for not submitting the paperwork although Mr. Hall had set up Mr. Walker by telling him

4  to take the paperwork home and return it later.  Mr. Walker notes that he need show only that Mr. Hall

5  "had some input into the decisionmaking process."

6       When "the person who exhibited discriminatory animus influenced or participated in the

7  decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment

8  decision." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1039-1040 (9th Cir. 2005); *see*

9  *Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005) ("An agent's biased remarks against

10  an employee because of his or her gender are admissible to show an employer's discriminatory animus

11  if the agent was involved in the employment decision.")

12       Mr. Walker further points to Ms. Kerksieck's "angry reaction" to protected conduct during his

13  September 30, 2008 interview with her.  In his deposition, Mr. Walker characterized Ms. Kerksieck to

14  have turned "the whole thing around on me" by accusing Mr. Walker of saying "Mexicans need to go

15  work in the fields."  Mr. Walker further faults Ms. Kerksieck's failure to recognize Mr. Walker's

16  protected conduct and to admonish Mr. Garon for his angry reaction to Mr. Walker's comments about

17  Mr. Hall.

18       BES claims an absence of direct evidence that Ms. Kerksieck or Mr. Garon "engaged in conduct

19  or made statements which on their face proves the fact of retaliatory animus 'without inference or

20  presumption.'" BES relies on claims that Mr. Hall "was not the decision-maker at issue" and neither

21  participated in nor influenced the decision to terminate Mr. Walker.

22       Mr. Walker's direct evidence of a retaliatory motive creates a triable factual issue as to BES's

23  actual motivation, especially given that Mr. Walker's evidence need not be much.  Mr. Huddleston's

24  declaration is the most damning evidence for BES, which concedes that it creates a factual issue as to

25  Mr. Hall's motives.  The declaration reflects that Mr. Hall was angry over Mr. Walker's comments and

26  taking measures to get rid of Mr. Walker to retaliate for his comments about Mr. Hall's discriminatory

27  conduct.  If Mr. Huddleston is believed, his comments prove retaliation.

28       Mr. Walker further bolsters his direct evidence by pointing to Ms. Kerksieck and Mr. Garon's

1   reaction to his comments about Mr. Hall.  The record supports other direct evidence of retaliation with

2   Mr. Hall's failure to return Mr. Walker to the Big West job, instruction to Mr. Walker to hold on to the

3   Kimberlina job paperwork, failure to contact Mr. Walker over the November 1-2, 2008 weekend, and

4   demand to submit the paperwork prior to a deadline Mr. Hall knew Mr. Walker could not meet.

5         BES' reliance on its claim that Ms. Kerksieck was the sole decisionmaker does not entitle BES

6   to summary judgment.  The record raises reasonable inferences that Mr. Hall influenced her decision in

7   that he provided her information on which she relied and was predisposed to terminate Mr. Walker.

8   There is no evidence that Ms. Kerksieck received or relied on information other than that from Mr.

9   Walker.  Mr. Walker has presented sufficient evidence that a retaliatory reason more likely than not

10  motivated BES to terminate Mr. Walker to defeat summary judgment.

11  **Prima Facie Case Of Retaliation**

12        In its moving papers, BES focuses on a prima facie case of retaliation.  To make out a retaliation

13  prima facie case, a plaintiff must demonstrate that:

14        1.      He/she engaged in protected activity;

15        2.      He/she suffered an adverse employment action; and

16        3.      There was a causal link between his/her activity and the employment decision.

17  *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065-1066 (9th Cir. 2003); *Fisher v. San Pedro*

18  *Peninsula Hosp.*, 214 Cal.App.3d 590, 615, 262 Cal.Rptr. 842.

19        "To establish causation, the plaintiff must show by a preponderance of the evidence that

20  engaging in the protected activity was one of the reasons for the adverse employment decision and that

21  but for such activity the decision would not have been made."  *Kraus v. Presidio Trust Facilities*

22  *Division/Residential Management Branch*, __ F.Supp.2d __, 2010 WL 1293788 (N.D. Cal. 2010) (citing

23  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir.2002)).  "The causal link may be

24  established by an inference derived from circumstantial evidence, 'such as the employer's knowledge

25  that the [plaintiff] engaged in protected activities and the proximity in time between the protected action

26  and allegedly retaliatory employment decision.'" *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988)

27  (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).

28        BES focuses on the causal link element of the retaliation prima facie case and claims that Mr.

Walker is unable to establish that his complaints about Mr. Hall's racially discriminatory conduct "played a role in his discharge or that the discharge decision would not have been made but for his alleged report on September 30, 2008" to BES interviewers.  BES "recognizes the possible inference of timing" between Mr. Walker's September 30, 2008 complaint about Mr. Hall and his November 5, 2008 discharge but argues that favorable treatment of Mr. Walker intervening his complaint about Mr. Hall and termination "dispels" an inference of a causal link between protected activity and adverse action. BES notes that after Mr. Walker's September 30, 2008 complaint about Mr. Hall, Mr. Walker remained on the Big West job, was promoted with a 30-percent pay increase to superintendent at the Kimberlina job, and was transferred with other employees who did not complain about Mr. Hall to the Long Beach Hiring Center on Kimberlina job completion.  BES points to Mr. Walker's "significant intervening act of insubordination" to culminate in Mr. Walker's termination.  BES concludes that "causation turns on whether Plaintiff would have been terminated for failure to timely submit the project paperwork regardless of his alleged protected activity."

Mr. Walker characterizes the Kimberlina transfer as a "bad thing" in that Mr. Hall used it to "set up" Mr. Walker who relied on Mr. Hall's comments that Mr. Walker would return to the Big West job. Mr. Walker notes that the close proximity between his September 30, 2008 comments and November 5, 2008 termination (36 days) no less than raises inferences of a retaliatory motive.  "[W]hen adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer Products*, 212 F.3d 493, 507 (9th Cir. 2000).

At a minimum, the timing of Mr. Walker's termination raises factual issues of whether BES retaliated against Mr. Walker for his comments about Mr. Hall's discriminatory conduct.   The Kimberlina job's 30-percent pay increase for Mr. Walker mitigates but does not dispel an inference of a causal link between Mr. Walker's comments and his termination.  The credibility of Mr. Walker's "set up" claims are beyond this Court's review at summary judgment and raises factual issues for the jury to defeat summary judgment.  Mr. Walker and Mr. Hall's differing version of events regarding the missing paperwork create material factual issues whether Mr. Walker was terminated due to protected activity.

**Legitimate, Non-Discriminatory Reason**

BES contends that if Mr. Walker establishes a prima facie case, BES is entitled to summary judgment in that "the record contains admissible evidence of a legitimate, nondiscriminatory reason for Plaintiff's termination" in that "the decision to discharge Plaintiff was based on his insubordination in repeatedly and intentionally failing to submit the project paperwork."

If plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for adverse employment action. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S.Ct. 1089, 1094-1095 (1981); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000), *cert. denied*, 533 U.S. 950, 121 S.Ct. 2592 (2001); *Guz*, 24 Cal.4th at 355-356, 100 Cal.Rptr. at 379; *Brundage v. Hahn*, 57 Cal.App.4th 228, 236, 66 Cal.Rptr.2d 830, 835 (1997). "The defendant's burden at this stage is one of production, not persuasion. The court may not make a credibility assessment." *Njenga v. San Mateo County Superintendent of Schools*, 2010 WL 1261493, at *14 (N.D. Cal. 2010) (citing *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). If the employer presents admissible evidence that one of more of plaintiff's prima facie elements is lacking or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer is entitled to summary judgment/adjudication unless the plaintiff produces admissible evidence to raise a triable issue of fact material as to the employer's showing. *Caldwell v. Paramount Unified School District*, 41 Cal.App.4th 189, 203, 48 Cal.Rptr.2d 448, 457 (1995).

Given that Mr. Walker's direct evidence of retaliation defeats summary judgment, this Court need not address BES' articulated reason to terminate Mr. Walker. In other words, the factual issues raised by Mr. Walker's direct evidence of retaliation eliminates evaluation whether insubordination was a legitimate, non-discriminatory reason to terminate Mr. Walker in that the evidence suggests that the insubordination reason was neither legitimate nor non-retaliatory.

**Pretext**

BES argues that it is further entitled to summary judgment in that Mr. Walker "cannot overcome the legitimate, nondiscriminatory reasons offered by Defendant for its decision to discharge Plaintiff" to demonstrate pretext.

1      "If the defendant offers admissible evidence of a legitimate, nondiscriminatory reason for the

2 claimed adverse action, the *McDonnell Douglas* framework and its presumption of discrimination

3 disappears, and the plaintiff is left to prove by a preponderance of the evidence that the reasons offered

4 by the defendant are merely a pretext for discrimination." *Njenga*, 2010 WL 1261493, at *14 (citing *see*

5 *Reeves*, 530 U.S. 133, 143, 120 S.Ct. 2097 (2000)).  If the employer carries its burden, plaintiff must

6 have an opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the

7 employer were not its true reasons but were a pretext for discrimination.  *McDonnell Douglas*, 411 U.S.

8 at 804; 93 S.Ct. 1817; *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *see Manatt v. Bank of America,* N.A.,

9 339 F.3d 792, 801 (9th Cir. 2003) ("Because [plaintiff] failed to introduce any direct or specific and

10 substantial circumstantial evidence of pretext, summary judgment for the [defendant] must be

11 affirmed.") *Brundage*, 57 Cal.App.4th at 236, 66 Cal.Rptr.2d at 835.

12      To challenge pretext, BES notes that after Mr. Walker's protected conduct of complaints about

13 Mr. Hall's racially discriminatory conduct, Mr. Walker remained in his position, was promoted with a

14 30 percent pay increase, and transferred to another BES division upon Kimberlina job completion.  BES

15 explains that despite his protected conduct, Mr. Walker:

16      1.    Was required to complete and submit timely paperwork;

17      2.    Was warned that failure to submit paperwork for the Kimberlina and Basin Valve jobs

18             would result in his termination; and

19      3.    Failed to submit timely the paperwork despite several requests for it.

20 BES points out that several employees who did not engage in alleged protected conduct were transferred

21 to the Long Beach Hiring Center upon Kimberlina job completion.  BES further notes that during 2007-

22 2009, four of 40 employees under Mr. Hall's supervision in Bakersfield were terminated and comprised

23 Mr. Walker (insubordination), Mr. Bryant (sleeping on the job) and two Hispanic employees (lack of

24 work eligibility documentation and job abandonment).  BES concludes that there is no "specific" or

25 "substantial" evidence that BES' proffered explanation is "unworthy of credence" or that Mr. Walker

26 "was treated less favorably than other employees who did not engage in the alleged protected conduct."

27      As discussed above, Mr. Walker has raised factual issues that retaliation for his comments

28 motivated his termination.  The factual issues raised by Mr. Walker's direct evidence of retaliation

1  demonstrate pretext to defeat summary judgment.

2  **Public Policy Claim**

3  BES argues that Mr. Walker's public policy claim is doomed without a valid section 1981 or

4  FEHA claim.[5]

5  The public policy claim appears to proceed under *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d

6  167, 172, 164 Cal.Rptr. 839, 842 (1980) ("*Tameny*") ("an employer's traditional authority to discharge

7  an at-will employee may be limited by statute . . . or by considerations of public policy").  There can be

8  no right to terminate for an unlawful reason or purpose that contravenes fundamental public policy.  *Silo*

9  *v. CHW Med. Found.*, 27 Cal.4th 1097, 1104, 119 Cal.Rptr.2d 698, 703 (2002).  "It is settled that an

10  employer's discharge of an employee in violation of a fundamental public policy embodied in a

11  constitutional or statutory provision gives rise to a tort action."  *Barton v. New United Motor*

12  *Manufacturing, Inc.*, 43 Cal.App.4th 1200, 1205, 51 Cal.Rptr.2d 328 (1996); *Cabesuela v. Browning-*

13  *Ferris Industries of Cal., Inc.*, 68 Cal.App.4th 101, 107, 80 Cal.Rptr.2d 60 (1998).  The plaintiff's

14  remedy is a common law tort action: "A wrongful act committed in the course of a contractual

15  relationship may afford both tort and contractual relief."  *Tameny*, 27 Cal.3d at 174-175, 164 Cal.Rptr.

16  at 843.

17  The elements for such a tort claim are:

18  1.     An employer-employee relationship;

19  2.     Termination or other adverse employment action;

20  3.     The termination or adverse action was a violation of public policy;

21  4.     Termination or adverse action was a legal cause of plaintiff's damage; and

22  5.     The nature and extent of plaintiff's damages.

23  *See Holmes v. General Dynamics Corp.*, 17 Cal.App.4th 1418, 1426 n. 8, 22 Cal.Rptr.2d 172, 177, n.

24  8 (1993).

25  Violations of FEHA and policies against race, sex, age and disability discrimination support

26  *Tameny* claims.  *City of Moorpark v. Superior Court*, 18 Cal.4th 1143, 1160-1161, 77 Cal.Rptr.2d 445,

27

28  [5]     BES explains: "Absent any reference to other statute or policy, Defendant brings the instant Motion on the premise that Count III is based on the public policy related to 42 U.S.C. § 1981 and/or FEHA."

1  455-456 (1998) (disability discrimination); *Stevenson v. Superior Court*, 16 Cal.4th 880, 896, 66

2  Cal.Rptr.2d 888, 897 (1997) (age discrimination).   However, if an underlying FEHA claim fails, "any

3  claim for wrongful discharge in violation of the public policy embodied in those claims fails." *Her v.*

4  *Career Systems Development Corp.*, 2009 WL 4928395, at *9 (E.D. Cal. 2009); *see Loggins v. Kaiser*

5  *Permanente Intern.*, 151 Cal.App.4th 1102, 60 Cal.Rptr.3d 45 (2007) (analyzing FEHA claim and

6  wrongful discharge in violation of the public policy together).

7        BES fails to demonstrate the failure of Mr. Walker's section 1981 and FEHA claims.  As such,

8  his public policy claim continues.

9                    **CONCLUSION AND ORDER**

10       For the reasons discussed above, this Court:

11  1.      DENIES BES summary judgment; and

12  2.      CONFIRMS the August 24, 2010 pretrial conference and October 4, 2010 trial.

13       IT IS SO ORDERED.

14  **Dated:    June 22, 2010**              **/s/ Lawrence J. O'Neill**
                                             UNITED STATES DISTRICT JUDGE